Filed 4/27/23  In re Nicholas P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NICHOLAS P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS P.,<br><br>    Defendant and Appellant. | A163065<br><br>(Contra Costa County Super. Ct. No. J18-01060) |

Nicholas P. appeals from juvenile court orders terminating his probation unsuccessfully and vacating his wardship.  He contends the court lacked authority to make the "unsuccessful" finding and, if it had such authority, the finding was based on a mistaken premise, was not supported by the evidence and unlawfully punished him for having a substance abuse disorder.  Nicholas also contends the juvenile court erred in permitting him and his parents, rather than the probation department, to bear the cost of the substance abuse treatment it ordered as a condition of probation.  We find no merit to Nicholas's challenges to the termination order.  As we will explain,

Nicholas is correct that wards and their families generally cannot be made liable for the costs of court-ordered treatment, although further inquiry may be necessary to determine the applicability of the rule in this case.

## BACKGROUND

### I.

### *Prior Appeals*

Nicholas has a lengthy history with the juvenile court. He has been diagnosed with conditions including attention deficit/hyperactivity disorder, epilepsy, depression, anxiety and post-traumatic stress disorder, and has a history of substance abuse, self-harm and Welfare and Institutions Code[1] section 5150 psychiatric holds. Prior to the present case, a wardship that began in 2015 was terminated unsuccessfully in 2018 after Nicholas violated probation by testing positive for marijuana; entered three residential programs only to be terminated from each after a brief stay; and was found to pose a danger to himself, hospitalized and then released early from a voluntary residential drug treatment facility for poor behavior.

The present appeal is the fourth in a case that began with a wardship petition (§ 602) filed in December 2018. The 2018 petition alleged that Nicholas, then 17 years old, committed felony vandalism (Pen. Code, § 594, subd. (b)(1)) and misdemeanor possession of a controlled substance (Health & Saf. Code, § 11375, subd. (b)(2)). In the underlying incident, Nicholas's father called the police about him vandalizing the family home and responding police officers observed him engaging in erratic and aggressive behavior that led to him being placed under a section 5150 psychiatric hold. The juvenile

---

[1] Further statutory references will be to the Welfare and Institutions Code except as otherwise specified.

2

court dismissed the drug possession count, found Nicholas had committed misdemeanor vandalism, adjudged him a ward of the court with no termination date, and ordered him to reside with his parents under the supervision of the probation department. Nicholas appealed, and we affirmed the rulings in an unpublished opinion. (*In re Nicholas P.* (Aug. 25, 2020, A157056) (*Nicholas P. I*).)

In June 2019, Nicholas admitted violating probation by failing to submit to three drug tests. In August 2019, a supplemental petition was filed alleging that Nicholas committed assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), assault by means likely to produce great bodily injury (*id.*, § 245, subd. (a)(4)) and felony vandalism (*id.*, § 594, subd. (b)(1).) Nicholas had become angry and engaged in a physical altercation with a friend who was at his house, lunged at the friend with a kitchen knife, dented the friend's vehicle by stabbing and throwing rocks at it, and once arrested banged his head against the metal divider in the police car. Nicholas pleaded no contest to the charges of vandalism and assault by means likely to produce great bodily injury. The court found these allegations true, dismissed the count alleging assault with a deadly weapon, and committed Nicholas to the Youthful Offender Treatment Program (YOTP). Nicholas appealed and we affirmed the rulings with specified modifications. (*In re Nicholas P.* (July 31, 2020, A158426) (*Nicholas P. II*).)

In December 2019, Nicholas filed a motion to modify the YOTP commitment order and place him in a drug treatment program. After some months of delays in considering Nicholas's motion, the probation department reported that Nicholas had made significant progress in YOTP and was nearing the completion of the institutional portion of the commitment. It recommended that upon his completion of that portion, the court order that

he advance to the aftercare phase of YOTP, reside with his parents, receive certain services and participate in an intensive outpatient substance abuse and mental health treatment program. On June 25, 2020, the juvenile court adopted the department's recommendations.

Less than a month later, on July 20, 2020, the probation department filed a notice of probation violation, alleging that Nicholas violated a probation order requiring that he "not knowingly use or possess any illegal drugs, marijuana, synthetic marijuana, drug paraphernalia, alcohol or any prescription drugs for which he does not have a current prescription from a duly licensed physician." The department alleged that Nicholas possessed drugs that had not been prescribed for him—specifically, Clonazolam that he said he had purchased from Amazon. Nicholas admitted possessing "drugs that were not prescribed to [him]" and the juvenile court found the allegations true.

The probation department's July 23, 2020 report stated, "Although [Nicholas] has multiple diagnoses, [he] has also exhibited manipulative behavior as evidenced in the YOTP institutional portion of the program and in the community. . . . [He] regularly requests changes in his medication and has admitted to not needing all the medication he is prescribed. And, in the past has stated he would stop taking them if he could be released from juvenile hall. . . . [¶] Kaiser mental health staff believes a dual diagnosis residential treatment will be most effective for [Nicholas], but only when he is ready for sobriety, is not drug seeking and his criminal escalation while using illicit substances has passed."

On August 6, 2020, the court continued Nicholas as a ward and committed him to YOTP. This led to Nicholas's third appeal. (*In re Nicholas P.* (Nov. 5, 2021, A161091) (*Nicholas P. III*).) In an opinion filed in

4

November 2021, we reversed the juvenile court's finding that Nicholas violated probation for lack of a factual basis: The probation order prohibited possession of illegal drugs and *prescription* drugs without a prescription, but Nicholas admitted only that he possessed "drugs" that were not prescribed for him, there was no evidence Clonazolam is an illegal or a prescription drug, and the People agreed on appeal that Clonazolam is not a prescription drug. We also reversed the related dispositional order.

## II.

### *The Present Appeal*

While the appeal in *Nicholas P. III* was pending, on November 2, 2020, Nicholas filed a petition to modify the August 6 YOTP disposition. The petition stated that Nicholas was being harassed by other minors on a daily basis, had been attacked twice, resulting in injuries including a dislocated shoulder, and had not received comprehensive substance abuse treatment during the two months he had been in the YOTP program. Nicholas sought modification of the disposition order to allow him to return home for shoulder surgery that was medically necessary due to a preexisting condition, and recovery afterward.

On November 17, 2020, the court granted the motion, set aside the commitment to YOTP effective December 8, the date scheduled for Nicholas's surgery, and ordered that Nicholas was to be placed on an ankle monitor, recuperate from the surgery at home, and receive ongoing outpatient treatment at Kaiser. At the hearing, the court made clear that the release from YOTP was necessary because it would not be safe for Nicholas to convalesce at YOTP, but that some of Nicholas's issues at YOTP were "of his own doing" in that he "engage[d] with people in a way that is blatantly offensive." The court believed Nicholas was "manipulative" and was "trying

5

to engage people in a negative way because he has a negative outlook," and observed that despite knowing he would be coming back to court for a review, Nicholas "still had a horrific program at YOTP." While acknowledging that YOTP might not have "the best of resources" for Nicholas, the court stated, "they are trying to work with Nicholas" and "Nicholas is not really trying to make it work there."

On December 3, 2020, the court further ordered that Nicholas's mother was to be in charge of dispensing his pain medication after surgery and his parents were to monitor his phone usage, which was to be limited to "essential and therapeutic appointments."

In February 2021, the probation officer related that Nadesdye Valdes, from Addiction Medicine at Kaiser, reported Nicholas's attendance at virtual therapy sessions had declined during the previous week, she had referred him to BAART Programs (BAART) for 30 days of daily methadone treatment in addition to his outpatient treatment, and if that treatment was not successful, he would be referred for an in-patient program. Therapist Julie Lindsay was working with Nicholas and his family through Functional Family Therapy (FFT) but suggested inpatient treatment would be most beneficial for him. According to the probation report, Nicholas "was initially evasive and failed to return calls or text[s] to Probation," and when the probation officer visited, Nicholas denied missing therapy sessions until being told the probation officer had spoken with the therapist. Nicholas said he had abused the pain medication provided for his post-surgical care, replacing it with other medication "so his parents would be unaware based on the quantity in his prescription bottle." He said he would begin methadone treatment and if it was unsuccessful he would be willing to attend in-patient treatment. Nicholas complained of pain in his surgically repaired shoulder

due to a conflict with his brother that "became physical and required police contact" and to lifting a heavy laundry basket.

Nicholas began methadone treatment on February 11 and reported feeling " 'normal and focused for the first time in a long time.'" His mother said he was "doing better" at home but had concerns about how much methadone was being prescribed and wanted Nicholas to attend in-patient treatment if the methadone treatment was not successful. She reported that the treatment had "a daily $15 co-pay and $67 per counseling session," and that she had to change her schedule to take Nicholas to treatment, which was "putting a strain on the family and resources." The probation officer was concerned about the sustainability of the current treatment plan in light of the question whether the parents could afford it long term, and the parents and Nicholas's therapist all suggested in-patient treatment ultimately would be the best solution. The probation department recommended a status review to evaluate the effectiveness of the methadone treatment and, if it was unsuccessful, recommended the court order in-patient treatment.

According to a March 9, 2021 probation report, when the probation officer spoke with Valdes on March 3, she "expressed concern about the drug testing at BAART" and said Nicholas "would be referred to in-treatment immediately." Valdes was supposed to contact Alhambra Valley Retreat about room availability "as [Nicholas] had agreed to attend the treatment," then follow up with probation, but she had not returned the probation officer's calls about this follow up. Lindsay also recommended that Nicholas attend "dual-diagnosis, residential treatment in hopes of a more in-depth opportunity to address his substance abuse and mental health needs." Nicholas's mother was "hoping" for him to attend residential treatment but the deductible would be $8,000 and the family would also have to pay 35

7

percent of the total cost of the facility and she did not know how the family would "finance the treatment and maintain a household."

Nicholas had been attending BAART daily and told the probation officer his mood had improved since starting methadone, and he "was praised by Probation for putting forth effort toward his sobriety." Nicholas "acknowledged the need for residential treatment, but stated, 'only if fail with the methadone.' 'If it doesn't work, I need residential.' " He said he had been "told on March 4, 2021, he was not officially referred to residential treatment and provide[d] an image of a letter he reported was given to him by Mrs. Valdes."

The probation officer stated that the department had been recommending residential treatment since January 2020 and had begun screening, but due to COVID restrictions and Nicholas's release from custody, he had been receiving outpatient treatment. According to the report, "[i]n the past [Nicholas] was not open to attending residential treatment, but appears to understand his treatment needs require more intensive intervention."

A letter from Valdes related that Nicholas was participating in the Early Recovery Program at Kaiser, successful completion of which required attendance at 36 Early Recovery discussion/support groups, 12 Chemical Dependency Education/Relapse Prevention Education groups, weekly drug testing and a "weekly minimum of one community-based recovery support meeting such as Alcoholic Anonymous." Valdes stated that Nicholas would be referred to a residential program "if he is unable to comply with any of the requirements." Nicholas was also participating in the approximately six hours of treatment groups each week and the methadone program through BAART.

At a hearing on March 9, 2021, court said it was pleased to see Nicholas was "doing better in his participation in out-patient" but continued to have concerns about whether this treatment would be sufficient to address his "severe substance abuse addiction." Although the court agreed with Lindsay that "dual diagnosis residential treatment would be best or optimal," it acknowledged that Nicholas's parents "might need more support through residential treatment" and Valdes was recommending outpatient treatment with methadone maintenance. The court stated, "I guess the recommendation to see how he does in out-patient as long as he can maintain regular attendance is fine" and said it was "willing to see how he does in the 45- to 60-day period," but expressed concern that "we are still in the same place" as at disposition in August 2020, when it was seemed clear that addiction was "the heart of what Nicholas struggles with," and "residential treatment is probably in his best interest."

After the court indicated it would set a review for 60 days, the probation officer suggested the matter could be put back on calendar if the minor was not doing what was expected, and the court responded that the "mechanism to get it back on calendar would be to file a [section] 777." The court noted that the "the last memo showed," and Nicholas acknowledged, "that he was struggling and that he was using the pain medication inappropriately," and "this is about being able to do something," so a section 777 petition should not be filed for "something de minimis" but for "something substantive." The court made clear to Nicholas that "everyone wants you to get the treatment that you need" and set a hearing for May 11.

On May 11, 2021, the probation officer reported that Nicholas had been receiving daily methadone treatment since his last court appearance on March 9, 2021. Nicholas and his family had completed therapy with the FFT

9

program, and the probation officer had congratulated Nicholas and verbally "worked through a list of goals" that would "assist [him] in successfully terminating probation.

The probation officer further reported that Nicholas sent him a text message on April 26 with a photo of a prescription bottle, saying his mother told him he had to show the officer any new prescriptions " 'just in case [Valdes] says I pee dirty for benzodiazepines.' " The prescription was filled at Safeway, "which was suspicious because Kaiser prescribes [Nicholas's] medications," and "[t]he physician listed on the bottle . . . has an address of . . . Wilshire Blvd, Los Angeles, CA, which is concerning because [Nicholas] has not visited a doctor in the Los Angeles area." Valdes told the probation officer that Nicholas "has repeatedly asked for a prescription, but Kaiser has never prescribed the drug" for him, and she "expressed concern" about Nicholas and "again recommended residential treatment." The probation officer contacted BAART and was told the program would " 'absolutely not' " prescribe Xanax to a patient and "use of Xanax would be completely against the goal of methadone treatment and therapy."

At a home visit, Nicholas "appeared disheveled and out of sorts." Asked about the prescription, Nicholas said, " 'but it's legit,' " and "explained he had been referred to someone by his uncle and was subsequently able to obtain the prescription for his panic disorder." The probation officer explained to Nicholas that "he is to be cared for by Kaiser and/or Kaiser referrals and inquired if his providers would be upset if he used Xanax and he agreed." Nicholas said he would " 'Just not use any more so that he would not get in trouble.' " Nicholas's mother asked the probation officer about the prescription and "her concern of [Nicholas] being reckless because he feels he

10

will be terminated from Probation." She "wanted [Nicholas] to be held accountable for his actions and not be able to supersede the system."

According to the probation officer, Nicholas "continues to disobey the rules set for him, by the Court. Although he is subject to multiple forms of treatment, [Nicholas] chooses to seek drugs and deceive his treatment providers who are desperately attempting to help him. It is evident [Nicholas's] manipulation has led to an extensive list of failed rehabilitative options. For a few months, while in the community, [Nicholas] showed a glimpse of behavior that would be indicative of a positive return to the community.

"It is clear [Nicholas] has a very serious substance abuse problem and has admitted an extensive history of illegal substance abuse including marijuana, cocaine, methamphetamine, heroin, LSD, psilocybin mushrooms and various prescription drugs, to include Xanax, Hydrocodone, Klonopin, Codeine, Promyethazine, Fentanyl and OxyContin and Clonazonam. Thus, it is highly probable that without intensive intervention, it is only a matter of time before [Nicholas] does irreparable, undue harm to the community or himself.

"Probation has exhausted all options for [Nicholas], who is now over 19 years of age. His Therapist at Kaiser Outpatient once again recommends [Nicholas] attend residential treatment, but [Nicholas] refuses to attend as he has over the past two years. Probation respectfully recommends [Nicholas's] war[d]ship be terminated unsuccessfully."

Nicholas was not present at the hearing on May 11, because he was on his way to the methadone clinic. The People submitted on the probation department's recommendation, counsel stating "I don't know what else can be done. It's an unfortunate situation and I hope that he gets the help he

11

needs." Nicholas's attorney also submitted. The court stated that it intended to follow the recommendation to terminate probation unsuccessfully and put the matter over for a week to deal with restitution issues. The court wished Nicholas the best and stated, "I wish we had a different recommendation that Nicholas had had a better performance on Probation. He is clearly struggling with addiction and I hope he gets the help that he needs. He is 19-and-a-half years old and I agree that Probation really does not have any further resources to provide to him, and I just hope that he is able to get back on the right track . . . ."

On May 18, the court set restitution at zero, terminated probation unsuccessfully and vacated the wardship.

Nicholas appealed.

## DISCUSSION

## I.

### *The Juvenile Court Did Not Exceed Its Jurisdiction.*

### A. Nicholas's Contention

The juvenile court is a "creature of statute" (*In re Jose H.* (2000) 77 Cal.App.4th 1090, 1099); its "powers are limited to those granted by the Juvenile Court law (Welf. & Inst. Code, § 200 et seq.) plus those incidental thereto." (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 6.) Orders outside the authority conferred by statute must be reversed. (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622, 1630.)

Nicholas argues there is no statutory authority for the juvenile court to declare that his probation was terminated "unsuccessfully."[2] Nicholas does

---

[2] The People acknowledge that Nicholas's failure to object in the juvenile court does not preclude him from arguing on appeal that the juvenile court lacked authority to make an order. (*People v. Scott* (1994) 9 Cal.4th 331, 354 [forfeiture rule does not apply to claim of unauthorized sentence].)

12

not suggest the juvenile court lacked authority to terminate probation; his objection is solely to the characterization of the termination as unsuccessful. In his view, the scope of juvenile courts' discretion to make findings regarding performance on probation is limited to findings that probation was *satisfactorily* completed, which is the statutory prerequisite to automatic sealing of juvenile records under section 786, and findings that the terms and conditions of probation were violated, which is the basis for revoking probation pursuant to section 777.

## B. Section 786 Authorizes the Juvenile Court to Determine Whether Probation Was Completed Satisfactorily.

"Section 786 authorizes the juvenile court to employ a streamlined, court-initiated procedure for dismissing juvenile delinquency petitions and sealing juvenile records in the custody of the juvenile court, law enforcement agencies, the probation department, and the Department of Justice, when a ward 'satisfactorily completes' probation or supervision, as long as the offense is not one listed in section 707, subdivision (b). (§ 786, subds. (a), (d).)" (*In re A.V.* (2017) 11 Cal.App.5th 697, 705 (*A.V.*).)[3] This "automatic sealing requirement" is in contrast to section 781, which "provides for a noticed petition procedure to seal a person's juvenile court records and related records" based on proof of rehabilitation after termination of juvenile court

---

[3] Section 786, subdivision (a), provides in pertinent part: "If a person who has been alleged or found to be a ward of the juvenile court satisfactorily completes (1) an informal program of supervision pursuant to Section 654.2, (2) probation under Section 725, or (3) a term of probation for any offense, the court shall order the petition dismissed. The court shall order sealed all records pertaining to the dismissed petition in the custody of the juvenile court, and in the custody of law enforcement agencies, the probation department, or the Department of Justice."

jurisdiction." (*In re O.C.* (2019) 40 Cal.App.5th 1196, 1200; § 781, subd. (a)(1)(A).)

As Nicholas acknowledges, section 786 authorizes juvenile courts to determine that probation has been completed satisfactorily. We agree with the People that this authority necessarily includes the authority to determine probation has *not* been satisfactorily completed: When a court declines to find probation was satisfactorily completed, it is obviously concluding probation was not satisfactorily completed.

Nicholas correctly points out that section 786 was not directly at issue in the present case, as the statute does not permit the juvenile court to seal records "if the petition was sustained based on the commission of an offense listed in subdivision (b) of Section 707 that was committed when the individual was 14 years of age." (§ 786, subd. (d).)[4] Nicholas was 17 years old when he committed the assault by means of force likely to produce great bodily injury underlying the sustained supplemental petition, and this offense is listed in section 707, subdivision (b)(14).

We are not convinced that the inapplicability of section 786 relief in Nicholas's case means the juvenile court lacked authority to find probation terminated unsuccessfully. While Nicholas would not have been entitled to have his record sealed under section 786 even if he had completed probation satisfactorily, the statute nevertheless confirms that it is not outside the

---

[4] Pursuant to subdivision (d) of section 786, "A court shall not seal a record or dismiss a petition pursuant to this section if the petition was sustained based on the commission of an offense listed in subdivision (b) of Section 707 that was committed when the individual was 14 years of age or older unless the finding on that offense was dismissed or was reduced to a misdemeanor or to a lesser offense that is not listed in subdivision (b) of Section 707."

14

juvenile court's jurisdiction to determine whether probation is terminated satisfactorily or unsatisfactorily.

Nicholas's arguments to the contrary are not persuasive. Nicholas points to cases that have commented on the absence of a singular established meaning for "unsuccessful" or "unsatisfactory" termination of probation, and the need to interpret these terms in the context of the particular statute at issue. *In re J.G.* (2016) 3 Cal.App.5th 521 (*J.G.*), for example, observed that consideration of a claim that the juvenile court erred in ruling that probation terminated unsuccessfully "requires, as an initial matter, clarification of the meaning and consequences of an order issued at the end of a term of probation that adjudicates its completion to be unsuccessful or unsatisfactory. When referring to the completion of probation, judges and litigants often use the terms 'successful' and 'satisfactory' interchangeably. But the terms are not always interchangeable and even the same term can have different statutory definitions. Differing statutes require that care be taken to identify the statute at issue, use the correct statutory term, and apply the definition specific to that statute to avoid confusion as to the nature of the court's finding and its effect." (*Id.* at p. 525.)[5]

---

[5] The juvenile court in *J.G.,* terminated probation unsuccessfully solely because restitution remained unpaid, and the court erroneously believed it lacked jurisdiction to enter a civil judgment for the restitution amount. (*J.G., supra,* 3 Cal.App.5th at p. 524.) Section 786 expressly provides that " '[a]n unfulfilled order or condition of restitution, including a restitution fine that can be converted to a civil judgment under Section 730.6 or an unpaid restitution fee shall not be deemed to constitute unsatisfactory completion of supervision or probation . . . .' " (*Ibid.*; § 786, subd. (c)(2).) *J.G.* found the juvenile court did have jurisdiction to enter the civil judgment, making it unnecessary to decide whether section 786 should be interpreted to preclude reliance on unpaid restitution as a sufficient basis for finding unsatisfactory completion of probation in all circumstances or only when the unfulfilled orders cannot be converted to civil judgments. (*J.G.,* at p. 526.)

*J.G.* offered an example of a statutory definition that does not require fulfillment of all probation conditions for probation to be found successful: "Penal Code section 290.46, subdivision[] (e)(2)(D)(i) and (e)(2)(D)(iv), provides that a convicted sex offender may apply for exclusion of his or her identity from the Internet if the offender 'successfully completed probation,' defined as completing the term of probation without being incarcerated for a probation violation nor convicted of another offense resulting in incarceration. Freedom from incarceration marks a 'successful' completion under that statute without regard to other conditions." (*J.G., supra,* 3 Cal.App.5th at p. 525, fn. 3; *In re Timothy N.* (2013) 216 Cal.App.4th 725, 736, fn. 8 (*Timothy N.*).)

On the other hand, "successful completion of probation, for purposes of dismissal under Penal Code section 1203.4, 'requires that a defendant successfully complete *every condition of probation* for "the entire period" of probation.' " (*A.V., supra,* 11 Cal.App.5th at p. 709, quoting *Timothy N., supra,* 216 Cal.App.4th at p. 738.)[6] *A.V.* contrasted the Penal Code section 1203.4 definition of successful completion of probation with section 786, which "requires only 'satisfactory completion' with probation

---

[6] The issue in *A.V.* was whether section 786 requires the juvenile court to use a single standard to determine whether probation was "satisfactorily" completed for purposes of dismissing the petition and sealing the records. The juvenile court dismissed the petition based on the probation department's report that the minor had completed his court-ordered obligations but refused to seal the records because the minor had sustained probation violations earlier in the probation period. (*A.V., supra,* 11 Cal.App.5th at pp. 701-704.) The *A.V.* court looked to the language and legislative history of section 786 to determine that the statute did not permit using different standards for the dismissal and sealing decisions. (*A.V.,* at pp. 706-711.)

16

and, to underscore the point, specifically defines 'satisfactory completion' as 'substantial compliance.' (§ 786, subd. (c)(1).) Substantial compliance is not perfect compliance. Substantial compliance is commonly understood to mean 'compliance with the substantial or essential requirements of something (as a statute or contract) that satisfies its purpose or objective even though its formal requirements are not complied with.' (Merriam-Webster Law Dict. <https://www.merriam-webster.com/legal/substantial%20compliance> [as of May 12, 2017].)" (*A.V.,* at p. 709.)

Nicholas emphasizes the absence of a set meaning for "unsuccessful" or "unsatisfactory" termination of probation to demonstrate the need for specific statutory authorization to make the finding in a given context. With respect to termination of juvenile probation, section 786 provides the authority and the applicable definition.[7] Section 786, subdivision (c)(1), provides that

---

[7] This conclusion makes it unnecessary for us to address Nicholas's contention that "the lack of clarity as to the meaning and consequences" of an unsuccessful or unsatisfactory termination of probation raises due process and equal protection concerns because youths in different courts may face different standards.

It also distinguishes *In re J.S.* (2015) 237 Cal.App.4th 452, 457, which Nicholas relies on to support his argument that the juvenile court may not make a finding the Legislature has not authorized it to make. *J.S.* involved discharges from the California Department of Corrections and Rehabilitation Division of Juvenile Justice (DJJ). Legislative changes that transferred supervision of juveniles from the DJJ to local juvenile courts eliminated the ability of the Board of Parole Hearings to make what had previously been a required determination whether a discharge was "honorable," a finding that would entitle the youth to automatic release from penalties and disabilities resulting from his or her offense. (*Id.* at pp. 454-455, 457.) The new legislation failed to create an alternative mechanism, and the question in *J.S.* was whether the juvenile court could make the determination. The *J.S.* court concluded that even though the problem was due to a legislative oversight, the juvenile court could not make the finding because the Legislature had not authorized it to do so. (*Id.* at pp. 458-460.)

"satisfactory completion of an informal program of supervision or another term of probation described in subdivision (a) shall be deemed to have occurred if the person has no new findings of wardship or conviction for a felony offense or a misdemeanor involving moral turpitude during the period of supervision or probation and if the person has not failed to substantially comply with the reasonable orders of supervision or probation that are within their capacity to perform." Satisfactory completion of probation, so defined, is the criterion the Legislature has chosen for minors who have come under the jurisdiction of the juvenile court to be deemed sufficiently rehabilitated to be entitled to automatic dismissal and sealing of their records, with "arrest[s] and other proceedings in the case . . . deemed not to have occurred." (§ 786, subd. (b).) Although Nicholas is not eligible for relief under section 786 due to his commission of a section 707, subdivision (b), offense, we see no reason a different standard would govern the evaluation of his probation at termination. In this context, the necessary substantive evaluation is the same whether the descriptive terms applied are "satisfactory" and "unsatisfactory" or, as in the present case, "successful" and "unsuccessful."[8]

---

[8] Nicholas relies on *Timothy N.*, *supra,* 216 Cal.App.5th 725, for its interpretation of "successfully completed probation" as meaning completion of probation without engaging in conduct providing a basis for revocation. *Timothy N.* was reviewing a plea agreement pursuant to which the prosecutor would reduce the felony charge to which the minor pled guilty to a misdemeanor if the minor "successfully completed probation." (*Id.* at p. 727.) After the minor fulfilled all conditions of probation other than restitution, the trial court converted the remaining restitution obligation to a civil judgment, found the minor " 'terminated probation entirely successfully' " and terminated jurisdiction " 'successfully.' " (*Id.* at pp. 727-728.) The prosecutor argued the minor did not successfully complete probation within the meaning of the plea agreement because the parties intended successful completion to mean successful completion of all terms of probation. (*Id.* at p. 728.)

18

Nicholas sees a finding that probation was terminated unsuccessfully as inconsistent with the purposes of the Juvenile Court Law. Juvenile proceedings are "primarily rehabilitative" (*In re Julian R.* (2009) 47 Cal.4th 487, 496); the Juvenile Court Law allows punishment "consistent with [its] rehabilitative objectives" (§ 202, subd. (b)) and "disallow[s] punishment in the form of retribution" (*Julian R.,* at p. 496; § 202, subd. (e).) Nicholas maintains that a finding of unsuccessful completion of probation serves no rehabilitative benefit but rather is a "counterproductive penalty" and impermissible punishment for the purpose of retribution (§ 202, subd. (e)) that "discounts youths' efforts and can be expected to impede their progress, limit their employment and educational opportunities, and expose them to enhanced punishment for any future contacts with the justice system (see [Cal. Rule of Court,] rule 4.421(b)(5) [unsatisfactory performance on probation is aggravating factor].)"

---

Applying "general contract principles" that required the plea agreement to be interpreted " 'based on an objective standard in which [the defendant's] "reasonable beliefs" control,' " and noting that probation may not be revoked for failure to pay victim restitution unless the minor willfully refused to pay or made insufficient effort to do so (§ 730.6, subd. (m)), the *Timothy N.* court held that the minor "would have reasonably believed that he would be deemed to have 'successfully complete[d] probation' if he completed his term of probation without having engaged in conduct that provided a basis for the court to revoke his probation." (*Timothy N.,* at p. 735.)

*Timothy N.* is of limited significance in the present case. The opinion did not purport to adopt a definition applicable to juvenile courts and cases generally; it employed principles of contract interpretation to discern the intentions of the parties to a single plea agreement.

We are not convinced that declaring probation unsuccessfully terminated is a punishment or sanction for misconduct,[9] as opposed to a consequence of failing to substantially comply with the requirements of probation. There is no guarantee that the rehabilitative goals of juvenile probation will be met in every case. While an unsuccessful termination finding may not have direct rehabilitative benefit, the potential for such a finding may provide incentive that does promote rehabilitative efforts. In any event, Nicholas's suggestion that a juvenile court may not take any action that is not directly rehabilitative mistakenly treats rehabilitation as the *sole* purpose of juvenile court proceedings. Rehabilitation is unquestionably primary, as we have said. But accountability is also a factor. Section 202, subdivision (b), provides that "[m]inors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." In an appropriate case, terminating probation

---

[9] "Punishment," for purposes of the Juvenile Court Law, "means the imposition of sanctions" and "does not include retribution." (§ 202, subd. (e).) Section 202, subdivision (e), lists five "[p]ermissible sanctions": Payment of a fine, community service, limitations on liberty imposed as a condition of probation or parole, commitment to a local detention or treatment facility, and commitment to the Division of Juvenile Facilities. Additionally, "in order to hold the offender accountable or restore the victim or community," the juvenile court may order a minor to complete a victim impact class, participate in victim offender conferencing, pay restitution to the victim, and make a contribution to the victim restitution fund after all victim restitution orders and fines have been satisfied. (§ 202, subd. (f).)

unsuccessfully may serve the purpose of holding the ward accountable and avoiding an implication that the terminated probation was successful.

This is not necessarily the "irreversible dead end" Nicholas sees it as. Section 781 provides an opportunity for a petition to seal juvenile records on a showing "that since the termination of jurisdiction . . . the person has not been convicted of a felony or of any misdemeanor involving moral turpitude and that rehabilitation has been attained to the satisfaction of the court." (§ 781, subd. (a)(1)(A).)[10] "To establish 'rehabilitation,' the petitioner 'must make a showing sufficient to convince the court that criminal behavior is in the past and will not be repeated. This is a determination based on the totality of the circumstances and individual factors will inevitably vary.' (*In re J.W.* (2015) 236 Cal.App.4th 663, 671-672.)" (*In re N.R.* (2017) 15 Cal.App.5th 590, 599, fn. 4.) A juvenile court's termination of probation as unsuccessful does not preclude the subject from later petitioning to seal his or her records under section 781. (*N.R.,* at p. 599, fn. 4 [current lack of rehabilitation "will not necessarily preclude a finding of rehabilitation at some point in the future]; *In re D.H.* (2020) 58 Cal.App.5th 44, 47, 55-56 (*D.H.*) [minor whose probation was terminated unsuccessfully not precluded

---

[10] Where, as in this case, the petitioner was adjudged a ward of the court for a section 707, subdivision (b), offense committed after age 14, section 781 imposes certain restrictions on consideration of the petition. In Nicholas's circumstances—where the petitioner was not committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, and is 18 years of age or more—the petitioner must have "completed any period of probation supervision related to that offense imposed by the court." (§ 781, subd. (a)(1)(D)(i)(II).) In specified circumstances, and for specified purposes, sealed records for a section 707, subdivision (b), offense may be accessed by a prosecutor, court and/or probation department in a subsequent criminal case. (§ 781, subd. (a)(1)(D)(ii), (iii), (iv).

from seeking relief under section 781 in future].)  Relief under section 781 is based on a showing of rehabilitation subsequent to termination of juvenile court jurisdiction, not during juvenile probation as required under section 786.

Finally, we do not agree with Nicholas's contention that finding probation was unsuccessfully terminated allows a court to circumvent the legislatively prescribed procedures for finding probation violations under section 777.  Section 777 sets forth the requirements for "[a]n order changing or modifying a previous order by removing a minor from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private institution or commitment to a county institution, or an order changing or modifying a previous order by directing commitment to the Youth Authority" based on violation of a condition of probation.  (§ 777, subd. (a)(2).)  In other words, the procedural requirements of section 777 must be followed if a more restrictive disposition is to be imposed as a consequence of a violation of probation.  Here, the court did not find a probation violation and order a more restrictive disposition.  It terminated Nicholas's probation and vacated the wardship, ending the court's supervision of Nicholas.  Section 777 was not implicated.

We conclude that the court did not exceed its jurisdiction in terminating Nicholas's probation unsuccessfully.

## II.

### *Nicholas's Other Challenges to the Termination Order Lack Merit.*

Aside from his claim that the juvenile court lacked authority to terminate probation unsuccessfully, Nicholas challenges the termination order on four grounds.  He contends the juvenile court abused its discretion by relying on the mistaken premise that his possession of Xanax was a

violation of probation; the termination order was not supported by substantial evidence that he engaged in conduct justifying revocation of probation; the order was not supported because he satisfactorily completed probation within the meaning of section 786; and the order unlawfully penalized him for having a substance abuse disorder.

## A. **Forfeiture**

In the proceedings below, Nicholas did not respond to the probation department's recommendation that probation be terminated unsuccessfully: His attorney submitted without argument and did not object when the trial court adopted the recommendation.

The parties dispute whether Nicholas forfeited the issues he now raises on appeal. "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) Nicholas maintains his claims are cognizable because "[c]laims regarding sufficiency of the evidence for a finding are never waived." Although Nicholas's statement is too broad, the forfeiture rule does not apply to claims that a judgment is not supported by substantial evidence, and this principle applies to findings on which a judgment was predicated. (*People v. McCullough* (2013) 56 Cal.4th 589, 596; *People v. Butler* (2003) 31 Cal.4th 1119, 1126, and fn. 4.)[11] The People rely on cases holding that the forfeiture

---

[11] *People v. McCullough, supra,* 56 Cal.4th at p. 596, explained, "Parties may generally challenge the sufficiency of the evidence to support a judgment for the first time on appeal because they 'necessarily objected' to the sufficiency of the evidence by 'contesting [it] at trial." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1469; see *People v. Rodriguez* (1998) 17 Cal.4th 253, 262 [sufficiency challenge to prior 'strike' allegation not waived]; *In re Troy Z.* (1992) 3 Cal.4th 1170, 1180-1181 [guilty plea or no contest plea

rule *does* apply to at least some sufficiency of the evidence challenges in the context of sentencing.  (*People v. McCullough, supra,* 56 Cal.4th at p. 591 [challenge to sufficiency of evidence to support finding of ability to pay booking fee forfeited by failure to object]); *In re N.R., supra,* 15 Cal.App.5th at p. 598 [challenge to sufficiency of evidence to support finding minor willfully failed to comply with condition of deferred entry of judgment forfeited by failure to raise issue in juvenile court].)

We need not resolve this point.  We have discretion to excuse forfeiture. (*In re S.B.* (2004) 32 Cal.4th 1298, 1293.)  Moreover, Nicholas argues that to the extent he may be found to have forfeited his claims, his attorney's failure to object constituted ineffective assistance of counsel.  Resolving that claim would require us to determine the merits, and we find it most expedient to do so directly.

**B. The Juvenile Court Did Not Rely on a Mistaken Premise.**

Nicholas contends the trial court abused its discretion in terminating probation unsuccessfully because it relied on the mistaken premise that he violated probation.  Nicholas sees the court's order as having been based on his possession of Xanax, which he maintains was not a violation of probation because he had a prescription for the medication.

Neither the probation department nor the juvenile court treated Nicholas's possession of Xanax as a direct violation of the probation condition prohibiting him from possessing prescription drugs without a prescription,

---

waives challenge to the sufficiency of the evidence].)  Although in *Butler* we observed that this exception may extend to court dispositions other than judgments (*Butler, supra,* 31 Cal.4th at p. 1126), claims subjected to appellate review have arisen from contested hearings and have almost invariably involved findings on which judgment of the court was predicated (see *id.,* at p. 1126, fn. 4 [collecting cases])."

and the People do not argue on appeal that Nicholas violated this condition. Rather, the probation officer's memo discussed Nicholas's obtaining the prescription from a doctor in Los Angeles, after his Kaiser treatment team declined to prescribe Xanax for him, as manipulative behavior that demonstrated he was "choos[ing] to seek drugs and deceive his treatment providers." When confronted, Nicholas agreed that his treatment providers would be "upset" if he used Xanax. Contrary to Nicholas's characterization, the situation was not akin to the juvenile court's error in *Nicholas P. III*, when it found Nicholas violated the probation condition prohibiting possession of prescription drugs without a prescription based on his possession of a drug that does not in fact require a prescription. This time around, there is no indication the court mistakenly believed Nicholas lacked a required prescription. The point was that Nicholas went around his treatment providers to obtain a prescription medication they did not believe he should take from a doctor he consulted specifically for the purpose of obtaining this medication, which was inimical to his substance abuse treatment.

C. **Substantial Evidence Supports the Termination Order.**

Nicholas argues the juvenile court abused its discretion in terminating probation unsuccessfully because there was no evidence he engaged in conduct providing a basis for revoking probation. This argument is based on *Timothy N.*'s description of successful completion of probation as completion of the term of probation without having engaged in conduct that provided a basis for revocation. (*Timothy N.*, *supra,* 216 Cal.App.4th at p. 735.) As discussed earlier, *Timothy N.* applied contract principles to interpret a plea agreement according to the intentions of the parties. To the extent its

"definition" of successful completion of probation differs from section 786's "satisfactory" completion standard, the latter is applicable here.

Nicholas offers no authority for his apparent assumption that probation cannot be terminated unsatisfactorily absent circumstances that would justify revoking probation. As earlier discussed, the situations are not identical: Revocation of probation generally means imposition of a more restrictive disposition while termination means an end to supervision.

Nicholas disputes the reasons given in the probation officer's May 11, 2021 report for terminating probation unsuccessfully. The main focus of that report was Nicholas's conduct in obtaining a prescription for Xanax. Nicholas maintains he did not technically violate the prohibition against possessing prescription medication without a prescription. This may be so, as there was no evidence the doctor who prescribed the medicine could not legitimately do so. But, as we have said, the manner in which Nicholas obtained the prescription was directly at odds with the goal of overcoming the substance abuse that was understood to be the underlying driver of his offenses. Nicholas had tried and failed to obtain a Xanax prescription from his treatment providers, and recognized they would be "upset" that he was using it. Regardless of whether this conduct would support a specific probation violation finding, it was certainly sufficient to show noncompliance with the November 17 and December 3, 2020 orders to participate in and complete outpatient treatment at Kaiser, which must reasonably be understood as requiring Nicholas to comply with the directives of his treatment providers.[12]

_____

[12] Nicholas questions the enforceability of these orders, which he describes as modifications of the August 6, 2020 dispositional order that we reversed in *Nicholas P. III.* He reasons that the November and December orders "logically fell with" the August 6 order, leaving the June 25, 2020

Moreover, it was not the Xanax incident alone but Nicholas's performance throughout his probation, and the probation department's lack of further resources, that led the juvenile court to terminate probation unsuccessfully. Aside from the Xanax, Nicholas had been doing well since the last hearing on March 9, as the probation officer's memo acknowledged. But Nicholas's actions in obtaining the Xanax prescription evidenced a return to the sort of conduct he had previously engaged in to obtain drugs despite orders intended to help him overcome and avoid abuse, such as putting other medication in the bottle of pain medication prescribed after his shoulder surgery in order to deceive his parents and abuse the pain medication.

Nicholas argues other statements in the probation report were not explained or supported. The statement that Nicholas "continues to disobey the rules set for him by the Court" is explained by the immediately following statement that he "chooses to seek drugs and deceive his treatment

_____

order as the last valid one, and argues that the June 25 order did not include outpatient treatment. Accordingly, in Nicholas's view, "to the extent the unsuccessful termination finding was based on perceived noncompliance with the order to participate in out-patient treatment, it was unsupported due to the lack of a valid order for outpatient treatment."

We do not find it self-evident that our reversal of the August 6, 2020 order necessarily invalidated all subsequent orders. But even if Nicholas is correct about the November and December orders, he is incorrect about the June 25 order. While the June 25 order did not on its face require Nicholas to participate in outpatient therapy (as the November and December orders did), it stated, "See recommendations attached, adopted and Ordered by the Court." Those recommendations included, "Minor to attend all scheduled medical appointments as directed by treatment provider" and "take all prescribed medication as directed by his physician." The accompanying probation report stated that Nicholas "will participate in an intensive outpatient program via Kaiser," outlined his treatment plan, and stated that Nicholas's initial appointment had been scheduled for July 7, 2020, the day after he was to be released from YOTP to its aftercare program.

27

providers." As we have said, even if not a direct probation violation, the Xanax incident was an attempt to evade the requirements of the treatment program Nicholas was required to abide by. It is also an example of the manipulation noted by the probation officer as a reason for the failure of various rehabilitation efforts over the course of the wardship. Nicholas argues the record refutes the statement that "it is evident [Nicholas's] manipulation has led to an extensive list of failed rehabilitative options" because Nicholas completed family therapy and remained engaged with his Kaiser outpatient therapy and BAART methadone program. While the positive aspects of Nicholas's conduct in the early part of 2021 are to be commended, they do not negate the manipulative and noncompliant conduct reflected, for example, in the Xanax incident, the deceit by which Nicholas was able to abuse his post-surgery pain medication, and the negative behavior in the YOTP program that the juvenile court commented on.

Nicholas's complaint that the probation officer offered no support for the statement that he refused to attend residential treatment " 'as he has over the past two years' " is also misguided. Nicholas contends he could not accept or refuse residential treatment without an actual referral to a program and there was no evidence an actual referral was made, a bed located, and financing secured.[13] This contention is directed to the period since the last dispositional order on August 6, 2020; Nicholas admits he refused an actual

---

[13] Indeed, Nicholas argues the evidence was to the contrary, as the March 2021 probation report related Nicholas's statement that he had been told he was "not officially referred to residential treatment" and stated that Nicholas "provide[d] an image of a letter he reported was given to him by Mrs. Valdes." The probation officer stated that attempts to clarify the referral status with Valdes had been unsuccessful and that while Nicholas "was not open to attending residential treatment" in the past, he "appears to understand his treatment needs require more intensive intervention."

referral to residential treatment in 2019.[14]  However, we understand the probation officer's comments about Nicholas' refusals to mean Nicholas's expressed attitude.  Nicholas told the probation officer in February 2021 that he would be willing to attend an in-patient program "if unsuccessful" with the methadone program, and the following month said he would attend residential treatment " 'only if fail with the methadone.' "  Nicholas maintains this was an expression of willingness to accept residential treatment, but in light of the therapists' apparently uniform view that residential treatment was what Nicholas needed, his expressly conditional phrasing supports an inference that he was *not* willing to go into residential treatment at that time.[15]

---

[14]  Nicholas acknowledges that he was referred to a residential treatment program in early July 2019 and refused to attend.  He points to a probation report noting that this was just after he was released from a section 5150 hold, he was afraid to miss a court hearing, and his parents had not yet met their insurance deductible, but he omits the report's further comment that when he appeared in court, he was ordered to follow the recommendation for residential treatment.

[15]  Nicholas characterizes his stance as consistent with his therapist's, stating that "he indicated he would be willing to attend if the methadone program was not successful, as his therapist also suggested."  The probation report he cites, however, also supports an inference that the therapist recommended trying methadone first because Nicholas would agree to residential treatment only if the methadone program was unsuccessful—i.e., that the conditional plan reflected Valdes's accommodation of Nicholas's position rather than first choice for treatment.  According to the report, Valdes simply told the probation officer she had referred Nicholas for methadone treatment in addition to his outpatient therapy and "[i]f the treatment is not successful, [Nicholas] would be referred to in-patient treatment program," with no elaboration as to who suggested this course of action.  Subsequently, Valdes recommended inpatient treatment.  Nicholas's family therapist consistently "suggested inpatient therapy would be most beneficial" for him.

29

Moreover, we are not persuaded by Nicholas's arguments that the probation report's reference to refusals "over the last two years" is irrelevant because it refers to "a different probationary period." Nicholas argues the juvenile court's evaluation of his performance on probation had to be limited to the period following the August 2019 disposition on the supplemental petition. As we have seen, a person satisfactorily completes probation under section 786, subdivision (c), "if the person has no new findings of wardship . . . during the period of . . . probation" and "has not failed to substantially comply with the reasonable orders of . . . probation." *D.H., supra,* 58 Cal.App.5th 44 applied the "plain language" of section 786 to find substantial evidence supported the juvenile court's finding that probation terminated unsatisfactorily where the minor admitted committing second degree burglary while on formal probation for a prior offense and failed to comply with other terms and conditions of his probation. (*D.H.,* at p. 54.) The facts recited in *D.H.* demonstrate that this determination was based on the entire period from the initial petition and disposition until the termination, not just the period following the second offense. (*Id.* at pp. 47-50.)[16]

_____

Nicholas additionally refers to his opening brief in *Nicholas P. II* (the appeal from his September 2019 placement at YOTP) as largely directed toward obtaining an order for residential treatment, thus illustrating that he "intently sought residential treatment." But Nicholas's apparent preference for residential treatment over a YOTP commitment says nothing about his attitude to residential treatment as compared to living at home while attending outpatient programs.

[16] The first petition in *D.H.* was filed in December 2018. (*D.H., supra,* 58 Cal.App.5th at p. 47.) The minor behaved poorly in juvenile hall, was released under a House Arrest Program that was terminated in February 2019, then in March 2019 admitted an allegation that was added to the petition, was declared a ward of the court and was placed on formal probation. (*Id.* at p. 48.) He committed a new offense three months later and

Nicholas argues that the "new findings of wardship" referenced in section 786 must be interpreted to mean conduct and findings postdating the most recent dispositional order because "[i]t would be nonsensical to go back in the minor's juvenile court journey to find something to disqualify him from relief," as this would defeat the purpose of providing rehabilitative services to help the minor improve over time. Whatever merit this argument might have in a case where the minor's conduct following the most recent disposition substantially complied with probation orders and conditions, that is not what happened here. Nicholas had a new finding of wardship in August 2019, while on probation for the December 2018 petition, following which he was released from YOTP not because he had successfully completed the program but because, despite what the juvenile court described as "a horrific program at YOTP," his need for surgery required that he be released to recuperate at home. He then admitted abusing his prescribed pain medication and, after a period of good performance, obtained the Xanax prescription his treatment providers refused to provide from a doctor in Los Angeles he contacted for that purpose. It would make no sense to preclude the court from considering his more recent conduct in light of his performance earlier in the wardship, especially as the recent conduct evinced a return to earlier patterns of behavior.

---

a subsequent petition was filed. (*Id.* at pp. 48-49.) He again behaved poorly in juvenile hall and had not begun classes required as conditions of his probation. (*Id.* at p. 49.) When the court terminated probation in November 2019, it "noted minor's behavior and his failure to complete any of the required community service or counseling, despite being on probation for over a year." (*Id.* at p. 50.)

**D. Unsuccessful Termination Was Not a Penalty for Having a Substance Abuse Disorder.**

As Nicholas accurately describes, the record reflects that he had longstanding substance abuse and mental health disorders which were recognized by his family therapist and the court as underlying the conduct that resulted in his wardship. As earlier discussed, Nicholas views an unsuccessful termination of probation finding as a form of punishment. He argues that because he was actively engaged in a chemical dependency program and "did not violate any conditions of his probation by possession of his prescription medication," the finding that he "unsuccessfully completed probation effectively and unlawfully punished him for his substance abuse and mental health disorders." The finding was "even more harsh," he maintains, in light of the "shortcomings of the juvenile system" and lengths to which he and his family had to go to "arrange and fund his services on their own." He points out that although though his offenses stemmed from mental health crises, he did not have access to the mental health diversion programs available to adults under Penal Code section 1001.35 and 1001.36 (*In re J.M.* (2019) 35 Cal.App.5th 999, 1003 ["mental health diversion law does not apply to juveniles in delinquency proceedings"].)

Nicholas's complaints about the financial burden on his family are the subject of the final section of this opinion. As for the inapplicability of Penal Code sections 1001.35 and 1001.36, *In re J.M.* explained why, due to differences between adult criminal and juvenile delinquency proceedings, "[d]isallowing adult-focused mental health diversion to juveniles promotes, rather than detracts from, the existing rehabilitative and mental health resources available under the Juvenile Court Law, while properly maintaining the legislatively-enacted distinctions between the two systems." (*In re J.M.,* at pp. 1009-1010.)

32

A person's "status as a drug addict cannot itself be punished." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1148; *Robinson v. California* (1962) 370 U.S. 660, 667.)  But "[c]onduct that drug addiction causes (e.g., use, possession, or sale) can be punished." (*Avila,* at p. 1148.)  As we have said, even if possession of the Xanax was not technically a violation of probation, the manner in which Nicholas obtained the prescription demonstrated evasion of and noncompliance with his treatment plan, and the Xanax incident was not the sole basis of the juvenile court's decision.  Section 786 refers to substantial compliance with reasonable orders of probation that are "within [the person's] capacity to perform." (§ 786, subd. (c)(1).)  If Nicholas's addiction resulted in a lack of capacity to comply with his treatment plan, a finding of unsatisfactory termination of probation might not be justified.  But the record indicates the juvenile court viewed Nicholas's conduct as manipulative, not a function of his addiction such that terminating probation unsuccessfully can be viewed as punishment for having a substance abuse disorder.

## III.

### *There Is No Statutory Authority for Imposing the Cost of Court Ordered Treatment on Probationers or Their Families.*

Nicholas argues the trial court erred by ordering substance abuse treatment without enforcing the probation department's obligation to pay for the treatment.  We agree.

### A. **Background**

When the juvenile court vacated the August 6, 2020 order committing Nicholas to the YOTP, the court ordered that following his shoulder surgery Nicholas would be released on home supervision and required to participate in the chemical dependency program at Kaiser.  The court ordered that the "ongoing out-patient treatment" was "to be facilitated by Probation."  The

33

Kaiser program referred Nicholas to BAART for daily methadone treatment, the probation department provided the necessary identification, Nicholas began the program on February 11, 2020, and the probation department verified his attendance.

Nicholas's mother soon told the probation officer that there was "strain on the family and resources," as the program had a daily $15 copayment as well as $67 per counseling session, and she had to change her schedule to take Nicholas to treatment. The probation officer reported to the court that he was "concerned about the sustainability of the current treatment plan as there [were] concerns [Nicholas's] parents may not be able to afford it long term." The probation officer also reported that Nicholas's parents and therapist "suggest[ed] in-patient treatment would be the best solution for [Nicholas] ultimately" and, subsequently, that Nicholas's mother was "hoping" for him to attend residential treatment but with an $8,000 deductible and the family responsible for 35 percent of the total cost of the facility, she did not know how the family would "finance the treatment and maintain a household."

## B. Analysis

### 1. *The Probation Department Has a Statutory Obligation to Pay for Court-Ordered Treatment.*

In *In re Cesar G.* (2022) 74 Cal.App.5th 1039 (*Cesar G.*), we reversed an order requiring a minor to pay the cost of driving under the influence (DUI) programs he was required to attend as a condition of probation, joining other courts that have "invalidated requirements that probationers or their families pay for the costs of treatment required as a condition of probation." (*Id.* at p. 1050, citing *In re M.W.* (2021) 67 Cal.App.5th 586, 589 (*M.W.*) ["Batterers' Intervention Program"], and *In re David C.* (2020) 47 Cal.App.5th 657, 671 (*David C.*) [psychological assessments].)

34

As we observed in *Cesar G.,* "[t]he Welfare and Institutions Code provides explicit authority for certain financial liability that may be imposed upon a ward" and "limits the costs that can be imposed on a minor's parents." (*Cesar G., supra,* 74 Cal.App.5th at p. 1049.) The express authority for imposing financial liability on a minor does not include the cost of substance abuse or mental health treatment.[17] "Parents may be liable for the 'reasonable costs of support' of a minor who is detained ([§ 903, subd. (a)]), but they are not liable for 'any costs of treatment or supervision for the protection of society and the minor and the rehabilitation of the minor.' (*Id.,* subd. (b).) At one time, section 903.2 authorized the juvenile court to require a ward's parent to cover the costs of ' "probation supervision" ' " (*Cesar G.,* at pp. 1049-1050, quoting *David C., supra,* 47 Cal.App.5th at p. 670), but amendments effective January 1, 2018 " 'largely eliminated statutory authority for charging wards and their families' the costs of probation." (*Cesar G.,* at p. 1050, quoting *M.W., supra,* 67 Cal.App.5th at p. 589.) "The Legislature largely eliminated statutory authority for charging wards and their families due to concerns about imposing costs on families that are already struggling." (*M.W.,* at pp. 589-590.) Even before these recent cases, caselaw had established that families " 'cannot be charged costs relating to

---

[17] We noted the statutes authorizing imposition of financial liability on a minor in *Cesar G.* (*Cesar G., supra,* 74 Cal.App.5th at p. 1049 [citing "§ 730, subds. (a)(1)(A) [ward may be ordered to make restitution or pay a fine], (b) [ward may be ordered to 'go to work and earn money for the support of the ward's dependents or to effect reparation and . . . keep an account of . . . earnings . . . and apply these earnings as directed by the court'], (d) [ward may be ordered to pay for sex offender treatment programs]; see also §§ 730.5 [ward may be ordered to pay a fine up to amount that could be imposed on an adult for the same offense] & 730.6 [ward may be ordered to make restitution and pay restitution fine].)"

the rehabilitation and treatment of a section 602 ward.' " (*Id.,* at p. 590, quoting *In re Nathaniel Z.* (1986) 187 Cal.App.3d 1132, 1135-1137.)

The People do not point to any contrary authority that would make Nicholas or his family responsible for the cost of treatment ordered as a condition of his probation. Instead, the People argue the issue was forfeited by Nicholas's failure to raise it below; Nicholas lacks standing to raise the issue on appeal; the juvenile court did not order Nicholas's parents to pay the treatment costs; and no authority established the court had a sua sponte duty to require the probation department to reimburse the parents.

### 2. *Nicholas's Failure to Raise the Issue Below Does Not Preclude Us From Considering It.*

Nicholas offers several reasons we should not view him as having forfeited this claim. We need not resolve the parties' dispute on these points. We have discretion to reach a forfeited issue that that presents a pure question of law. (*In re Sheena K., supra,* 40 Cal.4th at pp. 887-888, and fn. 7; *In re S.B., supra,* 32 Cal.4th at p. 1293.) The question Nicholas now raises is such an issue. (*Cesar G., supra,* 74 Cal.App.5th at p. 1047.) Additionally, since Nicholas argues that if the issue was forfeited, he received ineffective assistance of counsel, we would have to consider the merits in any case. We find it appropriate to do so directly.

### 3. *Nicholas Has Standing to Raise the Issue.*

We are not persuaded by the People's argument that Nicholas lacks standing to raise this issue. "Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations]. An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate

36

and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236.)

Nicholas's argument is that the juvenile court erred in permitting him and his parents to bear the cost of the substance abuse treatment it ordered. Since the probation department expected Nicholas's family to pay for the treatment, the "effect of the juvenile court's orders" was that Nicholas and/or his parents had to do so, or risk Nicholas being found to have violated probation. (See *Cesar G., supra,* 74 Cal.App.5th at p. 1050 ["effect" of orders requiring DUI programs and declining to order probation department to pay for them was that youth "must attend the DUI programs, and must pay for them"]; *M.W., supra,* 67 Cal.App.5th at p. 589 [where court ordered participation in program as condition of probation and refused to order probation department to pay, "[a]s a practical matter, M.W. or his family must pay for the program because the only alternative is to violate a probation condition"].) While it appears Nicholas's parents rather than Nicholas himself in fact paid for his treatment, Nicholas was part of the family unit directly affected by any financial hardship associated with this payment. All of the cases we have discussed concerning payment for court-ordered treatment considered the issue in the context of the minor's appeal and concluded that neither minors nor their families could be required to pay for court-ordered treatment except in the limited circumstances where statutes expressly impose this financial obligation. (*Cesar G.,* at p. 1050 ["courts have invalidated requirements that probationers or their families pay for the costs of treatment required as a condition of probation"]; *M.W.,* at p. 590 ["M.W. and his family are not liable for the program's costs"]; *David C., supra,* 47 Cal.App.5th at p. 671 [no authority for "holding juveniles and their parents or guardians financially liable"].)

#### 4. *The Juvenile Court Should Have Ordered the Probation Department to Pay for Nicholas's Treatment.*

The People contend Nicholas cannot prevail on the merits of his claim because the juvenile court had no sua sponte obligation to "shift the costs" of Nicholas's treatment to the probation department. The unspoken premise of the People's characterization is that Nicholas and his family were responsible for the costs of treatment unless relieved of that responsibility by court order. This is not correct. As we have said, in the absence of statutory authority, minors and their parents may not be required to pay the costs of treatment required as a condition of probation (*Cesar G., supra,* 74 Cal.App.5th at p. 1050; *M.W., supra,* 67 Cal.App.5th at p. 589; *David C., supra,* 47 Cal.App.5th at p. 671), and the effect of an order to participate in treatment as a condition of probation, absent any indication that the cost of treatment will be covered, is to require the minor and/or the minor's family to pay. (See *Cesar G.,* at p. 1050.) The rule must be the same where financial liability is imposed in practical effect as when it is expressly imposed by court order.

We are not persuaded by the People's apparent assumption that the probation department is not obligated to pay the costs of court-ordered treatment unless the court is requested to, and does, order such payment. *Cesar G., M.W.* and *David C.* all involved court orders addressing the payment issue: In *David C.,* an order expressly imposing financial liability on the minor and his parents (*David C., supra,* 47 Cal.App.5th at p. 670), and in *Cesar G.* and *M.W.,* orders declining the minor's request for an order requiring the probation department to pay for the mandated treatment. (*Cesar G., supra,* 74 Cal.App.5th at pp. 1048-1049; *M.W., supra,* 67 Cal.App.5th at p. 588.) But distinguishing *Cesar G., M.W.* and *David C.* on the basis that the court did not make a payment order is another way of

saying Nicholas forfeited the issue: The absence of an order in the present case is a consequence of the issue not having been raised below. We have already determined that any forfeiture does not preclude us from considering the merits. *David C.* held the minor could challenge the probation condition making him and his parents liable for the cost of psychological assessments despite not having objected to it in the juvenile court because the order was unauthorized. The financial liability imposed on Nicholas and his family was no less unauthorized.

The record reflects that the probation officer knew there were concerns about Nicholas's family's ability to finance his treatment and so informed the court. Both the department and the court knew or should have known of the probation department's statutory obligation to pay for the treatment. Perhaps Nicholas's attorney should have known this as well and requested an order requiring the probation department to pay, but it seems deeply unfair to treat this as a matter of ineffective assistance of counsel when the probation department failed to assume costs it had a statutory obligation to pay even while informing the court that the family's inability to pay might render Nicholas's treatment plan unsustainable.

The situation would be different, of course, if Nicholas and/or his family chose to assume the cost of treatment in order to utilize a program they preferred to that which the probation department could offer.[18] But the

---

[18] The People allude to this possibility in responding to Nicholas's argument that, to the extent his attorney's failure to raise the payment issue below is deemed a forfeiture, he received ineffective assistance of counsel. The People argue that Nicholas cannot make the showing necessary to prevail on appeal on a claim of ineffective assistance of counsel because he cannot demonstrate there "could be no satisfactory explanation" (*People v. Mai* (2013) 57 Cal.4th 986, 1009) for counsel's failure to raise the payment

record suggests this was not the case. The probation officer informed the court that Nicholas's mother's reported the methadone program was putting a strain on the family due to the $15 daily copayment and $67 per session cost of therapy and the need for her to change her schedule in order to take Nicholas for treatment; earlier in the case, the probation officer had reported that Nicholas's mother was "hoping" for him to attend residential treatment but "[did] not know how the family [would] finance the treatment and maintain a household," as they would have to pay an $8,000 deductible and 35 percent of the total cost of the facility.

On remand, absent any demonstration that Nicholas's parents chose to pay for services they preferred to ones the probation department would have offered, the juvenile court shall order the appropriate agency to reimburse Nicholas's parents for their out-of-pocket costs for court-ordered treatment. (*Cesar G., supra,* 74 Cal.App.5th at pp. 1050-1051; *M.W., supra,* 67 Cal.App.5th at p. 590.)

### DISPOSITION

The matter is remanded with directions to entertain any proceedings necessary to determine whether Nicholas's parents paid the costs of his court-ordered treatment by choice, as discussed herein, and, if not, to order reimbursement of the out-of-pocket costs by the appropriate agency. The order terminating Nicholas's probation unsuccessfully is otherwise affirmed.

---

issue, suggesting counsel could have known or believed that Nicholas was receiving "better or more convenient" treatment through his Kaiser insurance than what the probation department would have provided, or that Nicholas's family might have preferred paying for the treatment because they believed this would increase Nicholas's investment in his recovery.

_____

STEWART, P.J.

We concur.

_____

MILLER, J.

_____

MARKMAN, J.*

*People v. Nicholas P.* (A163065)

---

    * Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.